**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **PORTER DEVELOPMENT** | § | **CASE NO. 15-31305-H5-7** |
| **PARTNERS, LLC** | § | |
| **WB MURPHY ROAD** | § | **CASE NO. 15-31307-H5-7** |
| **DEVELOPMENT, LLC** | § | |
| **WB REAL ESTATE** | § | **CASE NO. 15-31770-H5-7** |
| **HOLDINGS, LLC** | § | |
| **WALLACE BAJJALI** | § | **CASE NO. 15-31772-H5-7** |
| **INVESTMENT FUND II, LP** | § | |
| **DEBTORS** | § | **CHAPTER 7** |

---

## TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON
## THE OMNIBUS OBJECTIONS TO INVESTORS' CLAIMS

---

1

# TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT                                                      8

II.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING     10

III.    STATEMENT OF THE ISSUE AND THE STANDARD                          10

IV.     UNDISPUTED FACTS IN ELLISOR CLAIMANTS' PLEADINGS            10

V.      BACKGROUND OF ELLISOR CLAIMANTS' INVESTMENTS IN FUND II12

        *A.     Formation of Fund II by Wallace and Bajjali*                          12

        *B.     Investors Provided Opportunity to Cancel Subscription in Fund II*       13

        *C.     U.S. Economic Financial Crisis (2008 – 2010  Great Recession)*          15

        *D.     Effects of National Economic Downturn - Houston's Real Estate Market*  17

        *E.     Wallace and Bajjali Consolidate Real Estate Holdings to Survive Crisis*   18

        *F.     Post-Merger Operating Loan Advanced to WB Holdings by Bryan Stanley*  21

        *G.     Wallace and Bajjali Make Plans for Initial Public Offering*              22

        *H.     Events Leading up to and Commencement of Debtors' and Related Debtors*23
        *Bankruptcy Proceedings*

VI.     SEC ENFORCEMENT ACTION AND SALE OF BIZRADIO ASSETS        24

        *A.     Ellisor Claimants as BizRadio Noteholders Representation in  SEC's 2009*  24
        *Enforcement Action*

        *B.     Ellisor Claimants Object to Receiver's Sale of BizRadio Assets*           25

        *C.     Ellisor Claimants Object to Receiver's Settlement - Wallace Bajjali Parties*  26

        *D.     SEC's Related Action against Wallace Bajjali Principals*              28

**VII.   ELLISOR CLAIMANTS' PROSECUTION OF STATE COURT LITIGATION**

    *A.   Ellisor Claimants' 2012 Lawsuit Against Wallace and Bajjali*　　**29**

    *B.   Ellisor Claimants 2014 Lawsuit Against Wallace and Bajjali*　　**30**

**VIII.  TRUSTEE'S ADMINISTRATION OF BANKRUPTCY ESTATES**　　**31**

**IX.   TRUSTEE'S GROUNDS FOR SUMMARY JUDGMENT**　　**33**

    *A.   Ellisor Claimants' Claims are Barred by Relevant Statute of Limitations*　**33**

    *B.   Claims of Ellisor Claimants were not Tolled against Murphy and Porter*　**38**

    *C.   Ellisor Claimants' Claims must be Subordinated Pursuant to 11USC 510*　**39**

**X.    CONCLUSION**　　**41**

## INDEX OF SUMMARY JUDGMENT EVIDENCE

Lowell T. Cage, Trustee relies upon and hereby incorporates by reference the following evidence, attached to the Declaration of Theresa Mobley in support of his Motion for Summary Judgment:

**Exhibit 1**    An article entitled "Timeline: A dozen key dates in the demise of Bear Stearns", reported in Reuters dated March 17, 2008

**Exhibit 2**    An article entitled "Lehman Files for Bankruptcy; Merrill Is Sold", by Andrew Ross Sorkin and reported in The New York Times Dated September 14, 2008

**Exhibit 3**    An article entitled "A.I.G.'s $85 Billion Government Bailout", by Dealbook and reported in The New York Times Dated September 17, 2008

**Exhibit 4**    An article entitled "Lehman files Chapter 11 bankruptcy, trying to sell assets", by Adam Shell, Matt Krantz, Sue Kirchhoff, John Waggoner, Kathy Chu and USA Today

**Exhibit 5**    An article entitled "Bush signs $700 billion financial bailout bill", published by M. Alex Johnson, Reporter msnbc.com dated October 3, 2008

**Exhibit 6**    An article entitled "Citi dodges bullet", published by Davis Elllis, CNNMoney.com staff writer, dated November 24, 2008

**Exhibit 7**    An article entitled, "Pirate of the Airwaves?", published by The Houston Chronicle, dated November 19, 2009

**Exhibit 8**    An article entitled, "SEC Sues Missouri City Businessman", published by The Fort Bend Independent, dated December 9, 2009

**Exhibit 9**    Excerpts from the testimony of Bryan Stanley at the hearing on Motion to Lift Stay held by the Court on March 19, 2018

**Exhibit 10**   Secured Promissory Note dated December 2, 2010

**Exhibit 11**   Pledge Agreement" dated December 2, 2010

**Exhibit 12**   UCC Financing Statement" Filed by David B. Giles, Filing Number 15-0009634553, Filing Date 03/31/2015 and Document Number: 599123850002 Filed with the Texas Secretary of State

4

**Exhibit 13**     Proof of Claim No. 2 filed by Bryan Stanley in WB Holdings' case and dated August 13, 2015

**Exhibit 14**     Complaint filed in Securities and Exchange Commission v. Albert Fase Kaleta and Kaleta Capital Management, Inc., and Business Radio Network, L.P., et al., Case No. 4:09-cv-03674 (S.D. Tex.) dated November 13, 2009

**Exhibit 15**     District Court Civil Docket for Case No. 4:09-cv-03674 Securities and Exchange Commission v. Kaleta et al

**Exhibit 16**     Receiver's Motion for Entry of Orders (I) Approving Bidding Procedures and Notice for the Sale of Radio Station Assets, (II) Approving Sale of Radio Station Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, and (III) Approving Compromise of Controversies and Partial Distribution of Sale Proceeds

**Exhibit 17**     Investors' Objection to Sale of Radio Station Assets and Motion for Continuance of Confirmation Hearing filed in Securities and Exchange Commission v. Albert Fase Kaleta and Kaleta Capital Management, Inc., and Business Radio Network, L.P., et al., No. 4:09-cv-3674 (S.D. Tex.).

**Exhibit 18**     District Court Memorandum and Order entered in Securities and Exchange Commission v. Albert Fase Kaleta and Kaleta Capital Management, Inc., and Business Radio Network, L.P., et al., No. 4:09-cv-3674 (S.D. Tex.) dated December 2, 2011.

**Exhibit 19**     Receiver's Motion for Order Approving Proposed Settlement and for Ancillary Orders filed in Securities and Exchange Commission v. Albert Fase Kaleta and Kaleta Capital Management, Inc., and Business Radio Network, L.P., et al., No. 4:09-cv-3674 (S.D. Tex.) dated September 12, 2011.

**Exhibit 20**     Objection to Receiver's Motion for Order Approving Proposed Settlement and for Ancillary Orders filed in Securities and Exchange Commission v. Albert Fase Kaleta and Kaleta Capital Management, Inc., and Business Radio Network, L.P., et al., No. 4:09-cv-3674 (S.D. Tex.).

**Exhibit 21**     District Court Memorandum and Order entered in Securities and Exchange Commission v. Albert Fase Kaleta and Kaleta Capital Management, Inc., and Business Radio Network, L.P., et al., No. 4:09-cv-3674 (S.D. Tex.) dated February 7, 2012.

**Exhibit 22**      District Court Order Approving Settlement and Entering Final Bar Order and Injunction filed in Securities and Exchange Commission v. Albert Fase Kaleta and Kaleta Capital Management, Inc., and Business Radio Network, L.P., et al., No. 4:09-cv-3674 (S.D. Tex.) signed by Judge Nancy F. Atlas on August 1, 2012.

**Exhibit 23**      District Court Civil Docket for Case #: 4:11-cv-01932 filed in Securities and Exchange Commission v. David Gordon Wallace, Jr. and Costa Bajjali., et al., (S.D. Tex.).

**Exhibit 24**      Complaint filed in Securities and Exchange Commission v. David Gordon Wallace, Jr. and Costa Bajjali., et al.,  Case No. 4:11-cv-1932 (S.D. Tex.) dated May 20, 2011

**Exhibit 25**      Agreed Final Judgment as to Defendant David Wallace filed in Securities and Exchange Commission v. David Gordon Wallace, Jr. and Costa Bajjali., et al.,, Case #: 4:11-cv-01932 (S.D. Tex.) dated May 24, 2011

**Exhibit 26**      Agreed Final Judgment as to Defendant Costa Bajjali filed in Securities and Exchange Commission v. David Gordon Wallace, Jr. and Costa Bajjali., et al.,, Case #: 4:11-cv-01932 (S.D. Tex.) dated May 24, 2011.

**Exhibit 27**      Case History in Ellisor, Ronald vs. Wallace, David G., Cause No. 2012-01447 (Harris Cnty. Dist. Ct.)

**Exhibit 28**      Plaintiffs Original Petition. in Ellisor, Ronald, et al. vs. Wallace, David G., et al. Cause No. 2012-01447  (Harris Cnty. Dist. Ct.)

**Exhibit 29**      "Tolling Agreements"

**Exhibit 30**      Case History in Ellisor, Ronald vs. Frishberg, Daniel., Cause No. 2014-36580 (Harris Cnty. Dist. Ct.)

**Exhibit 31**      Plaintiffs and Intervenors' Eighth Amended Petition. in Ellisor, Ronald, et al. vs. Frishberg, Daniel, et al. Cause No. 2014-36580  (Harris Cnty. Dist. Ct.).

In addition, the Trustee relies upon and hereby incorporates by reference the following

exhibits, attached to the Affidavit of Costa Bajjali:

**Exhibit 1-**    Chart of Organizational Structure of Fund II (2006) ("Fund II Organization Chart 2006")

**Exhibit -2**    Wallace Bajjali Investment Fund II, L.P. New Offering of Class A Units and Notice of Right to Rescind Subscription dated May 24, 2007 ("Right to Rescind Letter")

**Exhibit -3**    Confidential Private Placement Memorandum of Wallace Bajjali Investment Fund II, L.P. dated November 28, 2006 (the "Fund II PPM")

**Exhibit 4**    Wallace Bajjali Investment Fund II, L.P. Subscription Agreement (the "Fund II Subscription Agreement

**Exhibit 5 -**    Advisory Letter dated March 6, 2009, advising investors of proposed merger of Affiliated Funds into WB Holdings (the "Fund Consolidation Letter")

**Exhibit 6 -**    Contribution Agreement dated May 9, 2009, with Affiliated Funds and WB Holdings (the "Contribution Agreement")

**Exhibit 7**    Appraisal Consulting Assignment by Patrick O'Connor & Associated LP effective April 17, 2009 (the "O'Connor Appraisal")

**Exhibit-8**    2009 Organization Chart – WB Real Estate Holdings, LLC ("Fund II – Organization Chart 2009)

**Exhibit-9**    WB Holdings 3rd Quarter 2010 Report to Investors ("WB Holdings 2010 Quarterly Report")

**Exhibit 10**    Letters to Investors regarding Wallace Bajjali IPO (the "Investor IPO Letters")

In addition, the Trustee relies upon and hereby incorporates by reference **Exhibit 1** –

Cross Expert Report, attached to the Affidavit of Loretta Cross:

In addition, the Trustee relies upon and hereby incorporates by reference **Exhibit 1** –

Torzewski Expert Report, attached to the Affidavit of Joseph Torzewski:

In addition, the Trustee relies upon and hereby incorporates by reference his Affidavit.

TO THE HONORABLE EDUARDO RODRIQUEZ, UNITED STATES BANKRUPTCY JUDGE:

Comes now Lowell T. Cage, Trustee ("Trustee") of the bankruptcy estates of Porter Development Partners LLC ("Porter"), WB Murphy Road Development LLC ("Murphy Road"), WB Real Estate Holdings LLC ("WB Holdings"), and Wallace Bajjali Investment Fund II LP ("Fund II"), (collectively the "Debtors")  and Creekmont GP, Creekmont LP,  Lakecrest, Riata, Replacement, Sanctuary GP, Chancel GP, WB 2610, Meadow Crest GP, Meadow Crest LP, Morton GP, Morton LP, Substitute GP, West Houston, PPP Management, WBIF, WB Investment Fund II, and US Public – Fund I (collectively the "Related Debtors"),  in the above-entitled and numbered bankruptcy cases to move this Court, pursuant to Fed.R.Civ.P. 56, for an order granting summary judgment in his favor and against the investors who have asserted unsecured claims and who are identified in the Trustee's Omnibus Objections to Investors' Claims filed in this proceeding (collectively the "Ellisor Claimants"), and would respectfully show this Court as follows:

## I.

## <u>SUMMARY OF ARGUMENT</u>

The claims of the Ellisor Claimants against Murphy Road and Porter are time-barred.  The Ellisor Claimants are investors who made "investments" in one of the Debtors -- Fund II – and who allege they are owed monies by Debtors as "creditors" in the amounts of their "investments" based on the alleged negligence, breach of fiduciary duties by the Debtors' principals and managers, violation of the Securities Act, and fraud based on the merger and consolidation of Fund I, Fund II, and the LFW Fund  (collectively the "Affiliated Funds") into WB Holdings on or about May 26, 2009 (the "Merger").  (*See*, Schedule of Claims filed by the Ellisor Claimants which is attached as Exhibit A to the Trustees Omnibus Objections to Claims)

Limitations on the claims of the Ellisor Claimants are governed by the applicable two, three, and four-year statutes of limitations. As the Texas courts have explained, strict adherence to applicable statutes of limitations "help[s] ensure that the search for truth is not impaired by stale evidence or the loss of evidence, and that defendants are guaranteed a point of repose for past deeds after a reasonable period." *Childs v. Haussecker,* 974, SW.2d 31, 38-39 (Tex. 1998) (citing *S.V. v. R.V.,* 933 S.W. 2d 1, 3 (Tex. 1996)  As with the claims of the Ellisor Claimants, a cause of action accrues "when a wrongful act causes some legal injury, regardless of when the plaintiff learns of the injury and even if all resulting damages have not yet occurred". (*Exxon v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 209 (Tex. 2011))  The claims of the Ellisor Claimants relating to their investments accrued by the earlier date of their respective investments in Fund II  – November 2006  - and by no later than the date on which the SEC commenced the Enforcement Action - November 2009.. Limitations ran, therefore, by no later than November 2013.

The Ellisor Claimants also allege their claims against Murphy Road and Porter were  tolled by certain Tolling Agreements provided by WB Holdings and Fund II.  However, Porter and Murphy Road were not parties to the Tolling Agreements.  Therefore, the statutes of limitations were not tolled on the claims of the Ellisor Claimants against Porter and Murphy Road. *In re American Housing Foundation ,* 518 B.R. 386, 391 (Bankr. N.D.TX. 2014))

Finally, Section 510 of the Bankruptcy Code provides that for purposes of distribution under Title 11, "a claim arising . . . for damages from the purchase or sale of such a security, . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." *See,* 11 U.S.C. § 510(b). The claims of the Ellisor Claimants which on their face clearly relate to their investments as limited partners in the Debtors and/or Related Debtors,

including Fund II, must be subordinated to the senior claims of all creditors in the Debtors' and/or Related Debtors' cases.

## II.

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

1.      This action is a contested matter on the Trustee's Omnibus Claims Objections.  In August  2018, this Court conducted the Scheduling Conference on the Omnibus Claims Objections and entered its Scheduling Order.  Subsequently, the Trustee and the Ellisor Claimants filed their initial and second expedited motions to extend pre-trial deadlines. This Court granted the parties' expedited motions.  The deadline for filing dispositive motions is January 4, 2019. No trial date has been scheduled.

## III.

### STATEMENT OF THE ISSUE AND THE STANDARD

2.      This motion is made on the ground that no genuine issue of material fact exists on the Omnibus Claim Objections as to the running of limitations on the claims of the Ellisor Claimants against the Porter and Murphy Road estates and as to the subordination of the claims of the Ellisor Claimants which arise solely from their investments in the Debtors and/or Related Debtors to the claims of all other creditors pursuant to 11 U.S.C. § 510.  Therefore, the Trustee is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Echavarria v. Pitts*, 641 F.3d 92, 94 (5th Cir. 2011).

## IV.

### UNDISPUTED FACTS IN ELLISOR CLAIMANTS' PLEADINGS

3.      In the Ellisor Claimants' pleadings filed in this proceeding , including their Response to the Trustee's Omnibus Objections to Investors' Claims (the "Response") (Doc. No.189)  and their

Motion for Relief from Stay (the "Motion to Lift Stay") (Doc. No. 279), there are certain admissions made therein as follows:

(a)     The claims of the Ellisor Claimants are unliquidated.  Motion to Lift Stay

(b)     Fund I, Fund II, and LFW Fund [the Affiliated Funds] were three real estate partnerships that raised money from investors. Response  Each of these funds took in money and then created special purpose vehicles [limited partnerships] that purchased real estate. Motion to Lift Stay

(c)     David Wallace and Costa Bajjali were the officers, managers, and persons in control of the Debtors and Related Debtors. Motion to Lift Stay

(d)     On May 26, 2009, the real estate assets of Fund II, Fund, and LFW Fund [the Affiliated Funds] were contributed to WB Holdings in exchange for ownership interests in WB Holdings.   Response

(e)     After the merger of Fund I, Fund II, and LFW Fund [the Affiliated funds] into WB Holdings, Bryan Stanley loaned money to WB Holdings. Motion to Lift Stay

(f)     The SEC commenced an action against [Albert] Kaleta and his investment fund [Kaleta Capital Management] on November 13, 2009. Response

(g)     The SEC commenced Civil Action No. 4:11-cv-1931 against David Gordon Wallace J. and Costa Bajjali in Civil Action alleging that Fund II and LFW Fund invested a higher percentage of their assets in BizRadio [BusinessRadio Network LP] than their charters allowed.  Wallace and Bajjali agreed to pay civil fines as a result of the SEC enforcement action.  Motion to Lift Stay

(h)     The Ellisor Claimants did not invest in Murphy Road. Response

11

(i)      Only one [Ellisor] claimant, Alisa Jones, made a loan to Murphy Road in the amount of $19,094.85. Response

(j)      Ellisor Claimants have not sued Porter or Murphy Road but have filed claims in their bankruptcy cases. Motion __

(h)      Certain of the Ellisor Claimants purchased equity in Biz Radio ("BizRadio Equity Holders") , a now defunct entity, and/or purchased promissory notes from Kaleta Capital Management ("Biz Radio Noteholders"), also a now defunct entity. Response __

**V.**

**BACKGROUND OF ELLISOR CLAIMANTS' INVESMENTS IN FUND II**

**A.      <u>Formation of Fund II by Wallace and Bajjali</u>**

4.      In  2006, Will Perry, Wallace, and Bajjali, became partners in Perry Properties Realty Fund II, LP ("Perry Properties"), for the purpose of developing real estate projects and focusing on real estate and non-real estate investments.  Thereafter, on or about November 26, 2006, Wallace and Bajjali transferred their interests in Perry Properties to Will Perry; and contemporaneously with the sale of their interests, Wallace and Bajjali formed a new entity, Wallace Bajjali Development Partners LP, a Texas limited partnership ("WB Partners').  In exchange, Perry Properties assigned all of its interests in Perry Properties Investments II LLC (which changed its name to WBIF II GP, LLC) (the "General Partner") to WB Partners; and WB Partners became the sole owner of the General Partner.   Thereafter, Wallace and Bajjali (and not Will Perry) became responsible for the management of Fund II.  The purpose of Fund II was to solicit and provide investors with long-term capital appreciation through strategic acquisitions and development in the commercial and/or master-planned single-family residential real property markets throughout the state of Texas.  However,

Fund II also reserved the right to make investments in non-real estate related investments, investments outside the state of Texas, and in <u>investments in operating companies</u> (emphasis added). The partnership's management restricted the amount of invested dollars in any particular investment to not greater than thirty-three percent (33%) of Fund II's aggregate commitments of capital contributions. Later, during the economic downturn in 2009, Perry Properties, which managed the W.C. Perry Properties Realty Fund, LP (aka as Fund I), failed and the investors requested Wallace and Bajjali to take over the management of the W.C. Perry Properties Realty Fund, LP, which was later renamed to the West Houston WB Realty Fund, LP.  See, Bajjali Affidavit 3; Exhibit 1 - Fund II Organization Chart 2006)

### B.    Investors Provided Opportunity to Cancel Subscription in Fund II

5.    As the offering materials under which investors had originally invested were updated with material information relating to the name and ownership change of Perry Properties Realty Fund II LP to Fund II, all investors, including the Ellisor Claimants, were offered the opportunity to rescind their investment in Fund II and receive a refund of their subscription funds paid to Fund II. On or about May 24, 2007, all investors, including the Ellisor Claimants, were formally notified of their right to rescind their subscriptions for units in Fund II.  See, Bajjali Affidavit at 4; Exhibit 2 - Right to Rescind Letter at 3

6.    Investors who maintained their investment in Fund II were required to complete an Acknowledgement form and  new subscription documents including  the Confidential Private Placement Memorandum for Fund II (the "Fund II PPM") dated November 28, 2006. See, Bajjali Affidavit 5; Exhibit 3 - Private Placement Memorandum (Fund II) (the "Fund II PPM)   Class A Limited Partnership Interests were offered in 100 Class A Units at $100,000 per Unit.   Investors

were explicitly advised about the risk associated with their investments in Fund II as follows:

<u>THESE ARE SPECULATIVE SECURITIES INVOLVING A HIGH DEGREE OF RISK AND ARE SUITABLE ONLY FOR PERSONS WHO CAN AFFORD THE TOTAL LOSS OF THEIR INVESTMENT.</u>  See, Bajjali Affidavit at 5; Exhibit 3 - Fund II PPM at 1 of 40   In fact, investors were advised that they may not receive any return on their investment or even recoup any part of their investments.  See, Bajjali Affidavit at 5; Exhibit 3 - Fund II PPM at 2 of 40   Investors were also provided with opportunities to ask questions, receive answers, obtain additional information and complete their own due diligence concerning the partnership and offering of the Units prior to entering into any agreement to purchase Units. Multiple "Risk Factors" were identified and explained in detail to the investors in the PPM including but not limited to, risks of real estate investments, availability of financing, adequacy of reserves, lack of liquidity, leveraged investments, and dependence on key personnel. See, Bajjali Affidavit at 5; Exhibit 3 - Fund II PPM Pages 24 through 29.

7.     Investors who maintained existing units or purchased new units for limited partnership interests  in Fund II, including the Ellisor Claimants, were required to enter into the Subscription Agreement for Fund II.  Bajjali Affidavit  at 6; Exhibit 4 – Fund II Subscription Agreement.   All "individual" investors were required to represent that they were an "accredited investor" as  defined in Rule 501 under Regulation D of the Securities Act of 1933 in that they had a net worth (i.e. total assets minus total liabilities) exceeding $1.0 million. See, Bajjali Affidavit at 6; Exhibit 4 – Fund II Subscription Agreement   Moreover, all investors acknowledged in their Subscription Agreements that they had been provided with the offering materials and had carefully read such documents, and understood and evaluated the risks of purchasing their limited partnership

interests and that they had such knowledge and experience in financial, tax and business matters that made them capable of evaluating the merits and risks and making an informed investment decision. See, Bajjali Affidavit at 6; Exhibit 3 - Fund II PPM at 6.

8.      As of March 31, 2007, Fund II had sold  approximately $6.0  million Class A Units to investors,  had made numerous investments in limited partnerships with real estate assets, and had made investments in  BizRadio [BusinessRadio Network LP , a radio station business serving the Houston and Dallas markets). The majority of the investors in Fund II, including the Ellisor Claimants, were referred to Wallace and Bajjali by Daniel Frishberg as their financial advisor working through his firm Daniel Frishberg Financial Services Inc. ("DFFS").  See, Bajjali Affidavit at 7

9.      In mid-2007, Wallace and Bajjali determined that the amount of Fund II's investment in BizRadio had exceeded its self-imposed  $33%  limit of invested dollars in any particular investment.  For this reason, on or about May 24, 2007,  the General Partner of Fund II also sent the Right to Rescind Letter not only informing all investors about the name and ownership change in Fund II but also about the 41% investment concentration in Biz Radio.  Given Fund II's investment in BizRadio in excess of its self-imposed 33% concentration limit, all investors, including the Ellisor Claimants,  were provided the opportunity to rescind their subscriptions of Class A Units in Fund II. See, Bajjali Affidavit at 8; Exhibit 2 - Right to Rescind Letter at 3

**C.      U.S. Economic Financial Crisis (2008 – 2010 a/k/a The Great Recession)**

10.      Beginning in 2008, a series of financial crisis occurred that have later become known as the start of the "Great Recession."  These events were well publicized at the time in the national and local media.  For example, in March of 2008 over the course of only a few weeks the well-

known Bear Stearns & Company investment bank failed.  Its share value dropped in a week's time to but a fraction of its long traded value. http://blog.reuters.com/from-reuterscom/2008-03/17/12-key-dates-in-the-demise-of-bear-stearns/ (*Timeline: A dozen key dates in the demise of Bear Stearns;* Reuters March 2008).  In an extraordinary and highly public transaction, this failing venerable New York investment bank was bought by JP Morgan Chase in a transaction brokered by the Federal Reserve, at just $2 a share.  See, Mobley Dec.; Exhibit 1

11.     By September 2008, the reality of the financial crisis became acute, with a sudden collapse in financial institutions that threatened the entire global financial system.  The scale of the failure was dramatic and well publicized in the United States.  For example, an even larger New York investment bank, Lehman Brothers, suddenly collapsed, and filed bankruptcy on September 15, 2008.  *https://www.nytimes/2008/09/15/business/15lehman.html* (*Lehman Files for Bankruptcy; Merrill is Sold*; The New York Times September 2008)  A day later, the Federal Reserve announced a bailout via government backed guarantees of the many billions in obligations owing by insurance giant AIG. *https://dealbook.nytimes.com/2008/09/17/aigs-85-billion-government-bailout/* (*AIG's $85 Billion Government Bailout*, The New York Times September 2008)  Two weeks after AIG was bailed out and Lehman Brothers filed bankruptcy, even the federal government had to ac – this collapse     was     bigger     than     even     the     Federal     Reserve     could     handle. *https://abcnews.go.com/Business/story?id=5809047&page=1* (*Lehman files Chapter 11 bankruptcy trying to sell assets*; USA Today)  See, Mobley Dec.; Exhibits 2, 3, 4

12.     In an effort to calm falling stock prices and address a liquidity crisis that threatened every sector of the economy, the president signed into law the $700 billion Troubled Asset Relief Program ("TARP").  TARP created a special emergency loan program administered by the Federal

Reserve to assist banks and financial institutions and help them weather the liquidity crisis that followed. *http://www.nbcnews.com/id/26987291/ns/business-stocks_and_economy/t/bush-signs-billion-financial-bailout-bill/#.XBfWplVKi70 (Bush signs $700 billion financial bailout bill; msnbc.com October 2008)* See, Mobley Dec.; Exhibit 5

13.     The financial failure of large Wall Street investment banks was also accompanied by disasters at large and small banking institutions.  These were well reported at the time.  For example, on November 23, 2008, the federal government announced a massive rescue package for Citigroup. *https://money.cnn.com/2008/11/23/news/companies/citigroup/index.htm (Citi dodges bullet; CNN Money November 2008)* Similar commitments were made to a number of other large financial institutions, and steps were taken under TARP to shore up, on an emergency basis, many smaller banking institutions throughout the country. See, Mobley Dec.; Exhibit 6

**D.      Effects of National Economic Downturn on Houston's Real Estate Market**

14.     Houston was equally affected by these events; moreover, with the financial downfall also came the collapse of commodity prices, and particularly the price of oil and gas that are integral to the Houston area economy.  Oil prices dramatically dropped from a high of $145.56 per barrel in June 2008 to a low of $35.38 per barrel in January 2009.  The decline in oil prices was a symptom of the rapid deterioration in global economic stability brought on by the Great Recession.  The effects of the price drop was acutely felt in the Houston area with companies slowing or altogether stopping drilling programs, laying off workers, and sending less tax money to the state.  With employees facing the prospect of layoffs from Houston's vast oil and gas sector, real estate values, specifically

single family home values, fell precipitously, real estate development came to a standstill, and real estate development lending became nearly nonexistent.  (Torzewski Aff. Ex. At __)1

E.     **Wallace-and Bajjali Consolidate Real Estate Holdings to Survive Crisis**

15.     During this period of national and local economic crisis Wallace Bajjali's business operations and real estate projects were jeopardized.  The limited partnerships' lenders were demanding payment on outstanding mortgages, refusing to renew or extend payment on matured or short term loans, and, in some cases, threatening foreclosure on real estate projects. See, Bajjali Affidavit at 9

16.     In response to the extraordinary adverse economic developments, Wallace and Bajjali as General Partners and principals of the Debtors and Related Debtors proposed to consolidate the Affiliated Funds [Fund I, Fund II, and LFW Economic Opportunity Fund LP (the "LFW Fund")] into one consolidated holding company.  The proposed consolidation of the Affiliated Funds was undertaken in an effort to sustain business operations while completing development of ongoing real estate projects during the unprecedented financial crisis in the U.S. See, Bajjali Affidavit at 10

17.     In March 2009, Wallace and Bajjali  notified all of the limited partners and  investors of  Fund I, Fund II, and the LFW Fund, including the Ellisor Claimants, about the proposed consolidation of the Affiliated Funds by sending out the Fund Consolidation Letter and inviting the limited partners/individual investors, including the Ellisor Claimants, to attend formal meetings in Houston, Dallas, and San Antonio, for the purpose of discussing the consolidation of the Affiliated Funds. Fund Consolidation Letter)  In the Consolidation Letter, Wallace Bajjali reviewed the effect

---

1 Ms. Joseph Torzewski of the Stout Risius firm has been retained as an expert in this proceeding by the Trustee as authorized by this Court.  Mr. Torzewski has provided his expert report relating to the U.S. and local economic crisis during the period 2008-2010 to the Trustee. (Trustee's Affidavit;  Expert Report, Torzewski Affidavit. Ex. 1)

of the US and world economic downturn which was causing banks to not renew even performing loans.  Wallace and Bajjali also informed the investors that the Affiliated Funds had "certain real estate assets that are generating cash flow (through sales and development loans) and other real estate assets that have the need for capital and liquidity (for holding and improvements." Further, Wallace and Bajjali informed the investors that in an effort to ensure proactive positioning "for a sustained economic downturn, the General Partners of the Affiliated Funds are exploring the benefits of consolidating all of the real estate assets into one consolidated holding company."   At these formal meetings, the limited partners/individual investors, were allowed to vote to either accept or reject the proposed consolidation of the Affiliated Funds; and upon vote of the investors the Merger was overwhelmingly approved. See, Bajjali Affidavit at 11, Exhibit 5 – Fund Consolidation Letter at 1, 2, 4, 5, 8, 9 of 12

18.    Prior to consolidating the Affiliated Funds, Bajjali and Wallace engaged the firm Patrick O'Connor & Associates LP and Mr. W. F. Trotter Jr. ("Trotter")  to conduct an evaluation and assessment of combining three independent investor funds into a real estate holding company and analyzing the reasonableness of the allocation of the partnership interests (the "O'Connor Appraisal"). In his analysis, Trotter concluded that the allocation of the partnership agreements as presented by Wallace Bajjali --  WB Houston Realty Fund LP (13.5% % Total Cash Flow, $3,868,822 NPV); Wallace Bajjali Investment Fund II LP (74.0%   Total Cash Flow, $21,223,563 NPV); LW Economic Opportunity Fund LP (12.5%  Total Cash Flow, $3,574,315 NPV) did not

appear unreasonable based on the assumptions made therein. See, Bajjali Affidavit at 12; Exhibit 7 -
O'Connor Appraisal at 2, 3) "2

19.     After obtaining the approval of the limited partners/individual investors, Wallace and
Bajjali  acted for  Fund I, Fund II, the LFW Fund and WB Holdings and entered into the
Contribution Agreement in May 2009.  Pursuant to the terms of the Contribution Agreement, Fund II
contributed its percentage ownership interests in certain limited partnerships, limited liability
corporations, and joint ventures as identified therein  to WB Holdings. The equity interest of Fund II
in BizRadio was not contributed to WB Holdings.   Consequently, the consolidation transaction did
not affect Fund II's equity ownership in BizRadio. See, Bajjali Affidavit at 13; Exhibit 6 -
Contribution Agreement at 8 of 20

20.     Upon consummation of the Contribution Agreement, individual investors in Fund I,
Fund II, and the LFW Fund, held the same pro rata interest, which were held by them prior to the
consolidation, in the respective Fund's pro rata interest in WB Holdings.  After consolidation of the
Affiliated Funds, Wallace and Bajjali had the ability to provide loans from one entity to another
which was needed to protect real estate investments from foreclosure.  As a consequence, Wallace
and Bajjali shored up most investments for the limited partners/individual investors in the Affiliated
Funds.   After the consolidation into WB Holdings, Wallace and Bajjali continued to provide
financial reports to the limited partners/investors to keep them apprised on the ongoing real estate
projects, their related investments, and the conditions in the real estate market.     See, Bajjali

---

2 Ms. Loretta Cross of the Stout Risius firm, who has been retained as an expert in this proceeding by the
Trustee as authorized by this Court.  Ms. Cross, has provided her expert report determining the reasonableness of the
consolidation of the Affiliated Funds to the Trustee. See, Trustee Affidavit; Cross Affidavit – Exhibit 1 – Cross
Expert Report

Affidavit at 14, Exhibit 8 - Fund II Organization Chart 2009; Exhibit 9  WB Holdings 2010

Quarterly Report

### F.   <u>Post-Merger Operating Loan Advanced to WB Holdings by Bryan Stanley</u>

21.     Due to continued demands by their lenders to move outstanding loans elsewhere or to

make additional principal reductions on the outstanding loans as imposed by federal banking

regulators to reduce the banks' risks,  Wallace and Bajjali were require to secure a loan from a

private lender. After the Merger, Wallace and Bajjali obtained a secured loan from Bryan Stanley

("Stanley"), a personal acquaintance of Wallace, to fund operating costs and to preserve real estate

assets. See, Bajjali Affidavit at 16

22.     On December 2, 2010, Stanley loaned $1.6 million to WB Holdings (Stanley

Transcript at 101; Mobley Dec. Ex. 9)  To secure his loan, Stanley required WB Holdings to execute

a promissory note and security agreement pledging its holdings in the Affiliated Funds as collateral.

(Stanley Transcript at 161-162; Mobley Dec. Ex. 9; Stanley Note, Mobley Dec. Ex. 10; Stanley

Security Agreement, Mobley Dec. Ex. 13  Pursuant to the terms of Stanley's loan, WB Holdings paid

interest due on his promissory note. (Stanley Transcript at 103; Mobley Dec. Ex.9).   However, as of

the date on which the Debtors and Related Debtors commenced their bankruptcy proceedings,

Stanley's loan had not been repaid; and Stanley was owed approximately $1.688 million by WB

Holdings (Stanley Transcript at 108; Mobley Dec. Ex.9).   After the filing of the bankruptcy

proceedings, Stanley filed his secured proof of claim #2 in the WB Holdings case. (Proof of Claim

No. 2; Mobley Dec. Ex.13

G.      **Wallace and Bajjali Make Plans for Initial Public Offering**

23.      During the economic downturn, the only projects that were feasible were those that involved Public Private Partnerships.   Most cities had funds available in their Economic Development budgets and, by law; those funds could only be used for such purposes.  In other words, such funds could not be used as part of the general fund to provide basic services, such as fire or police protection.  By this way, public entities could leverage those funds to create additional tax base to make up for budget deficits during the downturn.  See, Bajjali Affidavit at 17

24.      Wallace and Bajjali created a Public Private Partnership Fund to fund the purist of such projects.  Tapping into the relationships and experience that Wallace had as former Mayor of the City of Sugar Land, Wallace and Bajjali formed several partnerships with the cities of Waco, Pearland, Amarillo and Joplin.  See, Bajjali Affidavit at 18

25.      In January of 2012, Wallace and Bajjali attended the US Conference of Mayors in Washington D.C. and met with about two dozen Mayors who expressed an interest in Public Private Partnerships for projects within their perspective cities.  However, Wallace and Bajjali did not have the resources required to pursue such large numbers and scale of projects.  For this reason, Wallace Bajjali followed the example of several private home builders and determined to develop an Initial Public Offering as a way to raise capital for its Public Private Partnership Projects.  Wallace and Bajjali negotiated and received a commitment letter for $20M of funding based on $100M pre-money valuation of projects under contract and in the pipeline.  The commitment was contingent on being able to secure a cornerstone investor for $5M and to eliminate or minimize the risk of investor litigation.  Wallace and Bajjali notified the investors, including the Ellisor Claimants, about their proposed IPO to facilitate their development of the Public Private Partnerships.  The investors

22

overwhelming approved their IPO proposal.  See, Bajjali Affidavit at 19; Exhibit 10 – Investors IPO

Letters

### H.    Events Leading up to and Commencement of Bankruptcy Proceedings

26.    During 2012 the principals and managers of Wallace and Bajjali made significant

progress in negotiating projects with the cities of Amarillo, Texas and Joplin, Missouri.  See, Bajjali

Affidavit at 20; Exhibit 10 –IPO Letters to Investors at 3.  They also continued to work in obtaining

bridge financing to cover legal, accounting, and marketing costs to develop the IPO offering.

However, development of the IPO was significantly delayed by the prosecution of litigation by

numerous investors.  Ultimately, adequate financing could not be secured and the IPO could not be

successfully developed due to the risks associated with the investors' pending litigation.

Additionally, the city of Joplin refused to pay Wallace and Bajjali $1.5 million in fees related to their

development of the city's projects.    This significant loss of revenue for the Wallace and Bajjali

entities could not be sustained in its operations and the threat of bank foreclosure on the assets of

WB Murphy Road Development, LLC and Porter Development Partners, LLC; and as a consequence

the principals and managers of Wallace and Bajjali were required to seek bankruptcy relief for the

Debtors and Related Debtors.   See, Bajjali Affidavit at 20

27.    On March 3, 2015, Murphy Road and Porter filed voluntary petitions for relief under

chapter 7 of the United States Bankruptcy Code. The next day, on March 4, 2015, Creekmont GP and

Creekmont LP filed their voluntary petitions chapter 7 cases. On April 2, 2015, the remaining

Debtors and Related Debtors filed voluntary petitions for relief under chapter 7 of the United States

Bankruptcy Code.

28.    On April 9, 2015, Lowell T. Cage was appointed as successor trustee for the Murphy

Road and WB Holdings' estates as well as the estates of all other Debtors and Related Debtors

29.     On May 22, 2015, this Court, after considering the motion of the Trustee, ordered joint administration of the Murphy Road and WB Holdings cases with the Related Debtors' cases.

## VI.

## SEC ENFORCEMENT ACTION AGAINST KALETA CAPITAL MANAGEMENT AND SALE OF BIZRADIO ASSETS

### A.     Ellisor Claimants as BizRadio Noteholders Representation in the SEC's 2009 Enforcement Action

30.     In November 2009, the Securities and Exchange Commission (the "SEC") commenced Civil Action No. 4:09-3674 in the United States District Court for the Southern District of Texas (the "SEC Enforcement Action") against Albert Kaleta and Kaleta Capital Management Inc.  ("KCM") (collectively the "Kaleta Defendants") for their fraudulent offering of promissory-note securities to approximately 50 investors.  In the SEC Enforcement Action, the SEC alleged that Kaleta directed KCM to loan approximately $6.7 million of the offering proceeds to BusinessRadio Network LP d/b/a BizRadio ("BizRadio") and Daniel Frishberg Financial Inc. d/b/a DFFS Capital Management Inc. (collectively the "Relief Defendants") two financially precarious KCM affiliates who had no reasonable prospect of repaying the loans.   By reason of their actions, the SEC alleged that Kaleta and KCM violated various sections of the Securities Acts of 1933 and 1934, the Exchange Act, and the Investment Advisers Act of 1940.  The SEC sought judgment against Kaleta and KCM and disgorgement from the Relief Defendants solely for the purposes of equitable relief. See, Mobley Dec.; Exhibit 14 – SEC Complaint; Exhibit 15 – District Court Civil Docket in the SEC Enforcement Action

31.     In December 2009, the District Court approved the Agreed Order of the SEC and Kaleta and KCM ordering the appointment of Thomas L. Taylor as receiver for KCM Assets (the "Receivership Order").  The SEC, Kaleta, and KCM simultaneously entered into their Agreed Judgment in which Kaleta and KCM agreed to injunctive relief and disgorgement of ill-gotten gains and payment of civil penalties for later determination by the District Court.   See, Mobley Dec.; Exhibit 15 – District Court Civil Docket in the SEC Enforcement Action

32.     In May 2010, the Receiver moved to modify the Receivership Order requesting an expansion of the receivership estate based on the alleged intertwined assets of the Relief Defendants and the Kaleta Defendants. Subsequently, the District Court entered an Order Modifying the Receivership Order and expressly expanded the scope of the receivership assets to include assets of the Relief Defendants.   See, Mobley Dec.; Exhibit 15 – District Court Civil Docket in the SEC Enforcement Action

**B.     Ellisor Claimants Object to Receiver's Sale of BizRadio Assets**

33.     In May 2011, after expansion of his powers by the District Court, the Receiver requested authority from the District Court to sell the radio station assets in Alvin, Texas, of BizRadio, one of the Relief Defendants, for the sum of $1.0 million, the assumption of certain expenses, and other non-cash consideration to South Texas Broadcasting Inc. ("STB") See, Mobley Dec.; Exhibit 16 – Receiver's Motion to Sell Biz Radio Station Assets  The Ellisor Claimants, as noteholders and/or investors of BizRadio, represented by their bankruptcy counsel, Mr. Charles Thomas Schmidt and the Schmidt Law Firm (collectively "Schmidt") as their counsel, objected to the Receiver's proposed sale to STB. See, Mobley Dec.; Exhibit 17 – Investors' Objection to Sale of Radio Station Assets

34.     After an initial hearing before the District Court in late June 2011, the Ellisor Claimants withdrew their objection to the Receiver's sale to STB but continued to assert their claim to the BizRadio assets and, therefore, the sale proceeds as <u>secured creditors</u> (emphasis added). Alternatively, they asserted their claim for equitable subrogation to the sale proceeds since their funds were allegedly used to pay off the original lender of BizRadio. In late October  2011, the District Court approved the Receiver's sale of the BizRadio assets. See, Mobley Dec.; Exhibit 15 – District Court Civil Docket in the SEC Enforcement Action

35.     On December 2, 2011, the District Court entered its Memorandum and Order approving the proposed sale,  rejecting the claims of the Ellisor Claimants' who were also BizRadio note holders and/or investors, and finding that the Ellisor Claimants as BizRadio noteholders did not establish that their funds paid the debts of BizRadio and that they did not hold enforceable security interests in the BizRadio assets.   See, Mobley Dec.; Exhibit 18 – District Court Memorandum and Order on Sale of BizRadio assets

### C.     Ellisor Claimants Object to Receiver's Settlement with Wallace Bajjali Parties

36.     By September 2011, the Receiver had completed his analysis and evaluation of the potential claims in the SEC Enforcement Action and reached an agreement to settle the receivership estate claims. the Receiver filed his Motion for Order Approving Proposed Settlement and for Ancillary Orders (the "Settlement Motion") in the SEC Enforcement Action.  In the Settlement Motion, the Receiver requested authority to settle all claims of the receivership estate against Wallace, Bajjali, Fund I, Fund II, and the LFW Fund, Spring Cypress Investments LP ("Spring Cypress Investments"), and Wallace Bajjali Development Partners LP ("WB Development Partners")

26

(collectively the "Wallace Bajjali Parties"). In connection with the settlement, the Receiver also sought entry of an order barring for all time claims of the Ellisor Claimants (as BizRadio Noteholders) against the Wallace Bajjali Parties (the "Bar Order") in connection with or related to loans or promissory notes obtained through any Wallace Bajjali Party as agent and issued by any BizRadio entity. However, the Ellisor Claimants (as BizRadio Noteholders) could assert their radio station loan-related claims through the claims process in the receivership estate. See, Mobley Dec.; Exhibit 19 – Receiver's Motion to Settle Claims with Wallace Bajjali Parties

37.     On October 2, 2011, the majority of the Ellisor Claimants (as BizRadio Noteholders) filed their formal objection opposing the Receiver's proposed settlement.   In their objection, the Ellisor Claimants (as BizRadio Noteholders) opposed the settlement and alleged that there was inadequate consideration for the settlement and that the settlement foreclosed their personal claims against non-parties. See, Mobley Dec.; Exhibit 20 – Investors' Objection to Receiver's Motion to Settle Claims with Wallace Bajjali Parties

38.     After hearing the representations of the parties on the Settlement Motion, after reviewing the financial documents of the Wallace Bajjali Parties, and considering the Receiver's assessment of the cost of litigation, difficulty of collecting any judgment and merits of the proposed settlement, the District Court approved the settlement and issued its Memorandum and Order on February 7, 2012.  In its Memorandum and Order, the District Court noted that "the Receiver points out that he is unaware of WB Fund II or the Note Entities having engaged in any wrongful or actional conduct regarding the receivership entities (other than the latter not having paid the WB/KCM Notes). (Memorandum and Order at page 19). See, Mobley Dec.; Exhibit 21 – District Court Memorandum and Order on Receiver's Settlement with Wallace Bajjali Parties

39.     On August 1, 2012, the District Court entered its Final Bar Order and Injunction which specifically ordered that "any and all of the BusinessRadio Note Holders are hereby permanently barred, restrained, and enjoined, . . . from commencing or continuing any judicial . . or other proceeding and/or asserting or prosecuting any claims and/or causes of action against any of the Wallace Bajjali Parties arising out of, in connection with, or relating in any way to the BusinessRadio Note Plan, the loans made to BusinessRadio or its related entities by the BusinessRadio Note Holders, and/or the notes issued by BusinessRadio or its related entities to the BusinessRadio Note Holders." See, Mobley Dec.; Exhibit 22 – District Court Final Bar Order

**D.      SEC's Related Action filed against Wallace Bajjali Principals**

40.     In May 2011, the SEC filed an additional enforcement actions related to the receivership proceeding in Civil Action No. 4:11-cv-1932 styled *SEC v. David Gordon Wallace Jr. and Costa Bajjali* (the "WB Related Action") alleging violations of the Securities Act of 1933. This action was initiated because of the investments by Fund II in BizRadio which exceeded the investment limits that the offering documents provided to investors represented would be taken in any single business or project. Wallace and Bajjali promptly settled with the SEC on its Complaint against them. See, Mobley Dec.; Exhibit 23 – District Court Civil Docket; Exhibit 24 - SEC Complaint  Agreed Final Judgment was entered in the WB Related Action in which Wallace and Bajjali agreed to a permanent injunction from future violations of the Securities Act and to payment of civil penalties in the amount of $60,000 each. See, Mobley Dec.; Exhibit 25 - Agreed Judgment – Wallace; Exhibit 25 - Bajjali

## VII.

## ELLISOR CLAIMANTS' PROSECUTION OF STATE COURT LITIGATION

### A.   Ellisor Claimants' 2012 Lawsuit Against Wallace and Bajjali

41.     On January 6, 2012, a majority of the Ellisor Claimants commenced Cause No. 2012-01447 in the 270th District Court of Harris County, Texas (the "2012 Lawsuit") against various defendants including Wallace, Bajjali, Wallace Bajjali Development Partners LP, WB Fund II, the LFW Fund, and Arthur Laffer.  In their 2012 Lawsuit, the Ellizor Claimants alleged that BizRadio was a "Ponzi scheme"; that the named defendants facilitated the alleged Ponzi scheme by soliciting investments from them into various funds and entities, including Fund II, WB Development Partners, and the LW Fund; that these funds funneled money to BizRadio; and that the defendants misrepresented how their money would be invested.  Having failed to prevail in the U.S. District Court in the SEC Enforcement Action to recover the proceeds from the sale of  the radio station assets and to prevent the Receiver's settlement with the Wallace Bajjali parties, the Ellisor Claimants (as holders of promissory notes owed to them by BizRadio) commenced the 2012 Lawsuit on the basis that the defendants acted negligently and fraudulently by investing in the Business Radio Network LP ("BizRadio).  See, Mobley Dec.; Exhibit 27 – Case History in 2012 Lawsuit

42.     Within days after filing the 2012 Lawsuit, the Ellisor Claimants Non-suited their litigation  and entered into a Tolling Agreement with the Defendants on January 17, 2012 (the "2012 Tolling Agreement").  Subsequently, a second Tolling Agreement was entered into among the parties in September  2013, extending limitation until the "earlier of July 1, 2014, or 30 days from the date that written termination of this Agreement has been served".  See, Mobley Dec.; Exhibit 29 – Tolling Agreements

29

43.     In the Tolling Agreements, the Defendants are identified on Exhibit A attached thereto as "David G. Wallace, Costa Bajjali, Wallace Bajjali Development Partners LP, Wallace Bajjali Investment Fund II LP, Laffer Frishberg Wallace Economic Opportunity Fund LP, and Arthur Laffer". The claims of the Ellisor Claimants are defined in the Tolling Agreements in  Paragraph 1(a) as "any and all claims and/or causes of action, if any, known or unknown, stated or unstated, of the Claimants against the Defendants that Claimants may have in connection with Claimants' relationship with Defendants and/or Defendants' relationship with Dan Frishberg, Albert Kaleta, Kaleta Capital Management, and the BizRadio entities. In the 2013 Tolling Agreement, "or their agents, affiliates, and representatives" are included as "Defendants"). Porter and Murphy Road are not identified as Defendants in the Tolling Agreements. See, Mobley Dec.; Exhibit 29 – Tolling Agreements

### B.     Ellisor Claimants 2014 Lawsuit Against Wallace and Bajjali

44.     On June 25, 2014 (two and one-half years later), the Ellisor Claimants initiate another lawsuit in Cause No. 2014-36580 styled *Ronald & Lavonne Ellisor et al. v. Daniel Frishberg et al* in the 61st Judicial District Court of Harris County, Texas (the "2014  Lawsuit") against 18 defendants including, but not limited to, Daniel Frishberg, and several Wallace-Bajjali related entities including Wallace Bajjali Development Partners LP, WB Fund II, LFW Fund, WB Holdings, West Houston WB Realty Fund,  and their principals, Bajjali and Wallace,  (collectively the "Frishberg Defendants"). Porter and Murphy Road again were not sued as parties. In the 2014 Lawsuit, the Ellisor Claimants alleged various claims against the Frishberg Defendants including, but not limited to, negligent misrepresentation, breach of fiduciary duty, and common law fraud. The genesis of the

30

claims asserted in the 2014 Lawsuit again arises from the Ellisor Claimants investments in the

defunct BizRadio.  See, Mobley Dec.; Exhibit 30 – Case History Docket in 2014 Lawsuit

45.    In June 2018, the Ellisor Claimants filed their 8th Amended Petition in the 2014

Lawsuit.  The Debtors and Related Debtors have not been severed as parties.  By footnote reference,

the Ellisor Claimants mention the bankruptcy proceedings of the related Wallace-Bajjali Debtors and

imposition of the automatic stay.3  In September 2018, the Ellisor Claimants filed a different 8th

Amended Petition in the 2014 Lawsuit. See, Mobley Dec.; Exhibit 31 – Eighth Amended Petition in

2014 Lawsuit

## `VIII.

## TRUSTEE'S ADMINISTRATION OF DEBTORS' AND RELATED DEBTORS' BANKRUTPCY ESTATES

46.    After his appointment, the Trustee initiated extensive due diligence to ascertain the

business affairs, outstanding claims by and against the Debtors and Related Debtors, and the assets

of the bankruptcy estates. The Trustee took immediate action to assess the 20+ bankruptcy estates of

the Wallace Bajjali entities including, but not limited to, retaining professionals for the estates,

consulting frequently with Bajjali and counsel for the Debtors and Related Debtors, inspecting and

recovering hard copy business records (contained in excess of 150+ boxes) from the business offices

in Sugarland, recovering the computer hard drive and electronic records (containing in excess of

400,000 pages), retaining Ms. Nancy Gollan (former CFO) to assist as needed in researching

business records as needed in his administration of the bankruptcy estates, conferring with counsel

for Stanley, counsel for the Ellisor Claimants about their investments and claims, and counsel for

---

3 In March 2018, this Court denied the Ellisor Claimants' Motion to Lift Stay disallowing them to continue
prosecution of their claims against the Debtors and Related Debtors, including Porter and Murphy Road.

lenders holding liens on real estate assets, consulting and interviewing real estate brokers for the purpose of marketing and selling the real estate assets, conferring with the Receiver and reviewing extensive pleadings filed in the SEC's Enforcement Action and the Ellisor Claimants' 2012 and 2014 state court lawsuits (See Section II *infra)*. See, Trustee's Affidavit at 2

47.     The most significant assets held among the bankruptcy estates were real estate tracts owned by Porter (43,394 acres located in Montgomery County, Texas) and Murphy Road (2.9 acres located in Fort Bend County, Texas). With considerable assistance by Bajjali, the Trustee engaged real estate brokers for marketing and selling these tracts of real property.  After obtaining approval from this Court, the Trustee closed on the sale of the Porter and Murphy Road tracts of real property and netted $1,818.350 and $ 571,659.95, respectively, in sale proceeds for their bankruptcy estates after payment of outstanding liens and closing costs. See, Trustee's Affidavit at 3

48.     During his administration of the Debtors' and Related Debtors' estates, the Trustee has provided regular Status Reports to this Court.  After substantially completing his administration of the Debtors' and Related Debtors estate, the Trustee and his counsel immediately began the claims review process.  When he could not resolve the disputed "investment" claims of the Ellisor Claimants, Trustee filed his initial objections to their claims in the Murphy Road and Porter cases in late 2017.  Thereafter, in February 2018 (approximately three years after commencement of the bankruptcy proceedings) the Ellisor Claimants moved to lift the automatic stay to liquidate their claims in their pending state court lawsuit. The Trustee and Stanley opposed their motion.  After conducting trial in March 2018, this Court denied their motion to lift the automatic stay and entered findings that the Ellisor Claimants provided no evidence of fraud by the Debtors or Related Debtors. See, Trustee's Affidavit at 4

49.     In connection with his Omnibus Objection to the Investors' Claims, the Trustee retained Ms. Loretta Cross and Mr. Joseph Torzewski as expert witnesses.  Ms. Cross and Mr. Torzewski have opined on the reasonableness of the Merger of the Affiliated Funds with WB Holdings and the economic and market condition during the period of time leading up to the Merger. See, Trustee's Affidavit; Cross Affidavit - Exhibit 1 (Cross Expert Report); Torzewski Affidavit – Exhibit 1 (Torzewski Expert Report).  Based on the Trustee's extensive due diligence of the Debtors' and Related Debtors' business affairs and the assessment and analysis provided in the Cross and Torzewski Expert Reports, the Merger served a legitimate business purpose. The Ellisor Claimants have provided no evidence of fraud by the Debtors or Related Debtors in entering into the consolidation of the Affiliate Funds with WB Holdings. Trustee Affidavit at 5.

50.     To the extent the claims of the Ellisor Claimants are disallowed against the Murphy Road and Porter estates, the Trustee may proceed to close these estates.  Monies from the Porter estate will flow to WB Holdings in satisfaction of its equity interest.  Trustee estimates the combined amount due to WB Holdings from Porter and Murphy Road is approximately $1.5 million.  Monies from Murphy Road would also flow to WB Holdings in satisfaction of its unsecured claim.  At that point, Trustee may then file his Final Report in WB Holdings' estate, pay the secured claim of Stanley in full (principal and partial accrued interest), and make an interim distribution from the unencumbered proceeds in Murphy Road to unsecured creditors and to the Ellisor Claimants on their subordinated claims with any remaining proceeds. Trustee Affidavit at 6

## IX.

## TRUSTEE'S GROUNDS FOR SUMMARY JUDGMENT

### A.     Ellisor Claimants' Claims are Barred by Relevant Statute of Limitations

33

51.     The date that an action accrues is a question of law. *Seureau v. Exxon Mobil Corp.,* 274 S.W.3d 206, 226 (Tex. App. – Houston [14[th] Dist.]*2008, no pet); accord Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex. 2003). Generally, a cause of action accrues "when a wrongful act causes some legal injury, regardless of when the plaintiff learns of the injury and even if all resulting damages have not yet occurred.*" Id. (citing KPMG Peat Marwick, 988 S.W.2d at 750,* S.V. v. R.V.*, 933 S.W.2d at 4).* A cause of action for fraud accrues on the date that the defendant makes the allegedly false representations. *Seureau* at 226. The Ellisor Claimants complain that the Debtors and/or Related Debtors misled them into making the investments by misrepresenting from the outset how their investments would be used and how safe the various investment vehicles would be and that the Merger of the Affiliated Funds with WB Holdings was fraudulent.

52.     The claims of the Ellisor Claimants are barred in their entirety by the applicable two, three, or four-year statutes of limitations. Claims for negligence, negligent misrepresentation, and civil conspiracy are governed by a two-year statute of limitations. *See,* Tex. Civ. Prac. & Rem. Code § 16.003; *Dunmore & Chicago Title Ins. Co.*, 400 S.W.3d 635, 640 (Tex. App. – Dallas 2013, no pet; *Weaver & Tidwell LLP v. The Guarantee Co. of N. Am.* USA, 427, S.W.3d 559, 565-566 (Tex. App. Dallas 2014, pet denied). The Ellisor Claimants' claims under the Texas Securities Act are governed by a three-year statute of limitations. *See* Tex. Rev. Civ. Stat. art 581-83(H); *Baxter v. Gardere Wyne Sewell LLP*, 182 S.W.3d 460, 463 (Tex. App. – Dallas 2006, pet denied). Where a plaintiff claims injury arising from fraud in connection with the sale of securities, typically the cause of action accrues at the time of sale. *See Arnold v. Life Partners, Inc.*, 416 S.W.3d 577, 590 (Tex. App. – Dallas 2013, aff'd, 464 S.W.3d 660 (Tex. 2015). Finally, claims of the Ellisor Claimants for

34

fraud, breach of fiduciary duty, and knowing participation in breach of fiduciary duty are governed by a four-year statute of limitations *Bonner v. Henderson*, No. 05-99-1582-CV, 2001 WL: 301581, at *6 (Tex. App. – Dallas Mar. 29, 2001, pet denied).

53.     Wallace and Bajjali began soliciting investors to invest in Fund II in November 2006. The offering materials told investors that "partnership business" would include investing in real estate and, at the election of the General Partner, making no-real estate investments like "investments in operating companies." The Ellisor Claimants who invested in Fund II were required to sign a Subscription Agreement. In signing the Subscription Agreements, the Ellisor Claimants warranted, among other things, that they had received and understood the offering materials, had sufficient knowledge and experience to evaluate the merits and risks of the investment, and could "bear a complete loss of an investment in the partnership." Although that agreement provided that Fund II could not invest more than 33% of the partnership's capital into any one investment, by May 2007 Fund II had already exceeded that limit with respect to its investment in BizRadio. By that time, Fund II had invested about 41% of its aggregate capital into BizRadio. Wallace and Bajjali sent the Right to Rescind Letter to investors informing them of this investment in BizRadio and allowing them to cancel their subscriptions on May 24, 2007.

54.     Beginning in 2008 the national and local economies faltered. The economic downturn significantly impacted the local real estate market which, in turn, jeopardized the real estate assets held by the Debtors and Related Debtors. Amid the growing real estate crisis during the national  recession beginning in 2008, Wallace and Bajjali determined to consolidate the Affiliate Funds with WB Holdings to survive the economic downturn. To that end, the Ellisor Claimants were sent the Fund Consolidation Letter notifying them about the effects of the recession on the

business operations of the Wallace Bajjali real estate operations and partnerships, inviting them to attend meetings and ask questions about the Merger, and allowing them to vote on the proposed Merger. In May 2009 the Merger of the Affiliated Funds occurred and WB Holdings was formed.

55.    In November 2009 the SEC Enforcement Action was commenced. The SEC lawsuit received local press. A Houston Chronicle article run just six days later detailed the allegations made, including that BizRadio, a "money-losing radio network" and DFFS both "received millions raised from investors under false pretenses." Loren Steffy, *Pirate of the airwaves?,* Houston Chronicle (Nov. 19, 2009) ("Nov. 2009 Article"), Mobley Dec.; Exhibit 7. A similar article appeared in the Fort Bend Independent (the local paper for the suburbs of Houston in Fort Bend County) shortly thereafter, *SEC Sues Missouri City Businessman for Alleged $10 Million Fraud*, Fort Bend Independent (Dec. 9, 2009)("Dec. 2009 Article"), See, Mobley Dec., Exhibit 8

56.    Upon commencement of the SEC Enforcement Action, the Ellisor Claimants (as BizRadio noteholders) knew their investments were in jeopardy, and knew that Wallace and Bajjali and Fund II were tied up with Frishberg in the SEC investigation involving BizRadio. Many of the Ellisor Claimants (as BizRadio noteholders) became actively involved and retained Schmidt to represent them in the SEC Enforcement Action. In fact, the Ellisor Claimants who were also BizRadio noteholders vehemently opposed the Receiver's settlement with the Wallace Bajjali parties in 2010 and the sale of the BizRadio radio station in 2011.

57.    The statutes of limitations on the claims of the Ellisor Claimants began to run as soon as they discovered or should have discovered *any* harm, however slight," resulting from the conduct of Wallace and Bajjali. *Am. Med. Elc., Inc. v.* Korn, 819 S.W.2d 573, 577 (Tex. App. – Dallas 1991,

writ denied) (emphasis in original); *see also Interfirst Bank-Houston, N.A. v. Quintana Petroleum Corp.,* 699 S.W.2d 864, 876 (Tex. App. – Houston [1st Dist.] 1985, writ ref'd n.r.e.)("knowledge of facts that would have excited inquiry into the mind of a reasonably prudent person, which, if pursued by him with reasonable diligence, would lead to the discovery of the fraud, is equivalent to knowledge of the fraud as a matter of law").

58.     Without question the Ellisor Claimants were not just in possession of facts sufficient to "excite inquiry" but that they knew about their injuries years before they filed the 2014 Lawsuit and well outside the applicable limitations period.  As noted, the Ellisor Claimants' core complaint is that Wallace and Bajjali misrepresented how their monies would be invested and later orchestrated the Merger to cover up their fraudulent management of the Affiliated Funds.   The Fund II offering materials disclosed investments would be made in non-real estate businesses, and the Ellisor Claimants acknowledged their understanding of the terms contained in their Subscription Agreements.  Several months later in May 2007, the Ellisor Claimants were sent the Right to Rescind Letter informing them of the 41% excess investment in BizRadio and allowing them to rescind their subscriptions.  In regard to the Merger, the Ellisor Claimants were sent the Fund Consolidation Letter informing them about the effects of the recession on the Wallace and Bajjali partnerships and inviting them to attend meetings on the Merger in mid-2009.  Moreover, by November 2009, many of the Ellisor Claimants who were BizRadio noteholders learned about the SEC Enforcement Action which was widely reported on in the press – claiming that BizRadio was insolvent and unable to pay its debts, to investors or otherwise.  Numerous courts have recognized that, where information about a plaintiff's injury is available in the public record,  that is sufficient to

37

put the plaintiff on notice. *See, e.g. BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 66-67 (Tex. 2011) (public record containing highly technical information sufficient to give notice), *Mooney v. Harlin,* 622 S.W.2d 83, 85 (Tex. 1981) (probate court record put plaintiff on notice).  Many of the Ellisor Claimants who were invested in BizRadio, knew they had suffered investment losses, and knew that Wallace and Bajjali and Fund II were tied up with Frishberg in the SEC investigation involving BizRadio.  In fact, they were actively represented by their bankruptcy counsel in the SEC Enforcement Action.  Clearly, the Ellisor Claimants actually "had knowledge of facts sufficient to cause them to inquire " about their investments, and that is all that Texas law requires to start the running of the statutes of limitations.

### B.      Claims of Ellisor Claimants were not Tolled against Murphy Road and Porter

59.While the Ellisor Claimants entered into the Tolling Agreements with the defendants in the 2012 Lawsuit, Murphy Road and Porter were not named or included as defendants in that litigation.  Moreover, Murphy Road and Porter were not parties to the Tolling Agreements.  Under Texas law, for a party to be included in a release, it must be apparent from reading the document that the party is included. *See, In re American Housing* Foundation, 518 B.R. 386, 293 (Bankr. N.D.TX 2014).

60.      The Texas Supreme Court applies the "stranger rule" to releases, stating that the "requirement of specific identification is not met unless the reference in the release is so particular that a stranger could readily identify the released party."  *See, Stafford v. Allstate Life Ins. Co.,* 175 S.W.3d 537, 543 (Tex. App.-Texarkana 2005).  In Stafford, the release in question stated that it included any "subsidiaries, affiliates, partners, predecessors and successors in interest and assigns" of Allstate Insurance Company, *Id.* Also, in the Stafford case, the release specifically referenced

Allstate Settlement Corporation and Allstate Life Insurance Company.  For that reason, the Texas Supreme Court found that even a stranger to the transaction would have little trouble concluding that Allstate Settlement Corp. and Allstate Life Insurance Co. were "affiliates" since they had similar names and were included in portions of the agreement itself. *Id.*

61.     Unlike Allstate in the Stafford case, Murphy Road and Porter were never mentioned in the Tolling Agreement, and there is nothing about their names that would allow a stranger to conclude that Murphy Road and Porter are an affiliate of any person of any entity defined as "defendants" in the Tolling Agreements.  Under Texas law, because a stranger could never conclude from a reading of the Tolling Agreements that Murphy Road and Porter were included, the Tolling Agreements are not enforceable against them.  Therefore, the statutes of limitations were not tolled on the alleged claims of the Ellisor Claimants.

### C.      Ellisor Claimants' Claims must be Subordinated Pursuant to 11 U.S.C. 510(b)

62.     Section 510(b) of the Bankruptcy Code subordinates claims arising from the purchase or sale of a security of the debtor or an affiliate of the debtor  "to all claims or interests that are senior to or equal the claim or interest represented by the security."  11 U.S.C. § 510(b)   This provision "serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *In the Matter of American Housing* Foundation, 78 F.3d 143 (5th Cir. 2015) (quoting *SeaQuest Diving, LP v. S&K Diving Inc. (In re SeaQuest Diving LP)*, 579 F.3d 411, 417 (5th Cir. 2009) quoting *Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)* 493, F3d 1067, 1071 (9th Cir. 2007)).

63.     As with the claimant in the bankruptcy case of American Housing Foundation filed in

the United States Bankruptcy Court for the Northern District of Texas, the claims of the Ellisor Claimants are based on various state law causes of action related to their investments. With respect to their "unliquidated claims" – ie, those for negligence, breach of fiduciary duties, and fraud – the Ellisor claimants clearly seek damages for their alleged injuries. *In re Matter of American Housing Foundation* at 154  (quoting  *Baroda Hill Invs., Ltd. v. Telegroup Inc. (In re Telegroup, Inc.),* 281 F.3d 133, 142 (3d Cir. 2002) ("Congress enacted § 502(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding.")  As noted by the 5th Circuit, "the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct" – ie, conduct after the issuance of the security – "such as breach of contract." *In re Matter of American Housing Foundation* at 17 (quoting *In re SeaQuest Diving, LP* at 154 (citing *Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 831-32 (oth Cir. 2001), *In re Telegroup, Inc.*, 281 F.3d at 141-42, *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180-81 (10th Cir. 2002), and *Rombro v. Dufrayne (In re Med Diversified, Inc.I, 461 F.3d 251, 256 (2d Cir. 2006)).*

64.     Finally, there is no doubt that the limited partnership interests the Ellisor Claimants purchased constitute  "securities" within the meaning of Section 510(b).  The Bankruptcy Code expressly defines the term "security" to "include[] . . . [an] interest of a limited partner in a limited partnership." 11 U.S.C. § 101(49)(A)(xiii). *In the Matter of American Housing Foundation* at 155 For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale." *In re Seaquest Diving LP,* 579 F3d at 410.   In their

proofs of claims filed in the Debtors and Related Debtors bankruptcy proceedings, the Ellisor Claimants assert that their unliquidated claims stem directly from their limited partnership investments (except for those few Ellisor Claimants who otherwise made loans).  Clearly, there is at least "some nexus or causal relationship" between the Ellisor Claimants' claims and the purchase of their limited partnership interests; and, therefore, they are subject to mandatory subordination pursuant to 11 U.S.C. § 510(b).

## X.

## <u>CONCLUSION</u>

65.     The party moving for summary judgment has the burden of demonstrating that the Rule 56 (c) test of "no genuine issue as to any material fact" is satisfied and that they are entitled to judgment as a matter of law.  The Trustee is entitled to judgment as a matter of law in this contested matter because the uncontradicted summary judgment evidence establishes that there are no disputed material facts.

WHEREFORE, the Trustee prays that after considering the evidence presented herein, the Court grant the Trustee's Motion for Summary Judgment, and enter a  judgment in favor of the Trustee, and that the Court grant the Trustee such other and further relief to which he may show himself to be justly entitled.

Respectfully submitted,

/s/ Theresa Mobley
_____
THERESA MOBLEY
State Bar No. 14238600

41

OF COUNSEL:

CAGE, HILL & NIEHAUS, L.L.P.
5851 San Felipe, Suite 950
Houston, Texas 77057
Telephone:  (713) 789-0500
Telecopier: (713) 974-0344
ATTORNEYS FOR LOWELL T.
CAGE, TRUSTEE

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of  January, 2019, a true and correct copy of the Trustee's Motion for Summary Judgment was sent by the Court's ECF and by electronic mail to counsel for the Ellisor Claimants, Charles Schmidt, 7880 San Felipe, Suite 250, Houston, Texas 77057.

/s/ Theresa Mobley
_____
THERESA MOBLEY